UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROBERT ANTHONY,

                    Petitioner,          **No. 6:13-CV-6198(MAT)**
         -vs-                            **DECISION AND ORDER**
SUPT. MICHAEL SHEAHAN,

                    Respondent.
_____

## I.   Introduction

Proceeding <u>pro se</u>, Robert Anthony ("Anthony" or "Petitioner"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being detained in Respondent's custody in violation of his federal constitutional rights. Anthony is incarcerated pursuant to a judgment entered on May 19, 2008, in New York County Court, Ontario County (Doran, J.), following a jury verdict convicting him of first degree burglary (N.Y. Penal Law § 140.30(2), (3)), first degree assault (<u>id.</u>, § 120.10(1)), and third degree criminal possession of a weapon (<u>id.</u>, § 265.02(1)).

## II.   Factual Background and Procedural History

Petitioner's conviction stems from an incident that occurred on June 18, 2007, in which Petitioner struck Jacob Vandemortel ("Jacob") with a metal pipe or rod, hitting his head and breaking his arm. At the time of the attack, Jacob was having sex with his estranged wife and mother of his child, Elisha Vandemortel ("Elisha"). Elisha, although still married to Jacob, was involved in a relationship with Petitioner. As a result of the assault, Jacob sustained permanent, visible scars on his head and limited arm mobility.

### A.    Petitioner's Trial

Jacob lived at 81 North Genesee Street in Geneva, New York. His uncle's family lived in the home attached to his, at 79 North Genesee Street. As of the time of the incident, Jacob and Elisha were married but living apart. Elisha was staying at 72 Wadsworth Street with Petitioner, whom she was dating. Jacob had known Petitioner for about two to three weeks at that time, but had no social relationship with him. Apparently, Jacob had seen Petitioner outside his uncle's home, and Petitioner announced that he wanted to fight him.

On June 18, 2007, Jacob was temporarily staying at 79 North Genesee Street to watch his 14-year-old cousin, Todd Vandemortel ("Todd"), while Todd's family was in Rochester. Jacob's friend, David Collins ("Collins"), also planned to sleep there that night. At about midnight, Collins was settling in on a couch downstairs. Elisha and Jacob were in the upstairs bedroom, having sex. Elisha had left her and Jacob's two-year-old child with Abrianna "Sweet Pea" Pesante ("Pesante") and Megan Vandemortel ("Megan"), Todd's sister, at 72 Wadsworth Street.

According to Pesante,[1] when Petitioner had been at 72 Wadsworth Street earlier that night, he had been told by Megan that Elisha was visiting Jacob. Pesante called Elisha twice and told her to come home, but Elisha did not. Pesante then went over

---

[1]

Pesante was subpoenaed to testify and was an uncooperative witness. She said that she had known Petitioner for years and described him as "family". They were related by marriage, not by blood.

to 79 North Genesee Street. Todd let her in, and she told him she wanted to speak with Elisha.

As Todd and Pesante mounted the stairs, Petitioner "busted in the [front] door" and ran past them. Todd saw a brown object in Petitioner's hand; Collins described it as a brown rod or metal pipe. Pesante testified that Petitioner was holding an object, but stated she did not know whether it was a metal pipe. At that point, Pesante left the house.

Once upstairs Petitioner kicked in the door to the bedroom where Jacob and Elisha were having sex. Collins heard Jacob yell, "[M]otherfucker!" According to Jacob, he and Elisha were in the missionary position when Petitioner burst into the room. Jacob turned to the side and put his arm up in an attempt to shield his face and head against Petitioner's blows. Petitioner hit Jacob with a steel bar once, striking Jacob's head and arm, and then ran from the room. Jacob briefly gave chase but stopped because he was bleeding profusely. From the top of the stairs, Jacob yelled to Collins to call an ambulance.[2]

Collins and Todd saw Petitioner jump down the entire flight of stairs and run from the house. Todd recalled that Petitioner looked right at him as Petitioner passed through the brightly-lit area at the bottom of the staircase.

---

[2]
Staples were needed to close his Jacob's head wound. The blow broke Jacob's arm, and he wore a cast for eight weeks. Jacob, who worked as a welder, testified that his arm is not as strong as it used to be, and he moves it more slowly, which has affected his ability to play the drums. Jacob had a lump on his arm at the time of trial as a result of the fracture, and scarring as a result of the head wound.

Trial counsel called Elisha to testify for the defense. Elish testified that although they were living apart, she and Jacob still had sexual relations "mostly for money so [she] could buy stuff to help [her] [drug] habit so [she] wouldn't get dope sick." T.254.[3] Elisha testified that she and Jacob used heroin and smoked crack daily. She also claimed that, before the trial had begun, she had been to "detox" and was using only methadone. On cross-examination, she admitted that she had used crack cocaine the day before appearing at trial. Elisha acknowledged serving jail time for violating probation for an unnamed conviction. She twice had been convicted of possession of a hypodermic instrument, and also had been also convicted of unauthorized use of a motor vehicle and petit larceny. She served prison time for possession and sale of heroin.

On June 18, 2007, she brought her and Jacob's baby to see Jacob, because it was Father's Day. At some point she brought her baby back to the apartment she shared with Petitioner on Wadsworth and returned to 79 North Genesee Street. According to Elisha, she and Jacob used drugs and consumed alcohol that night. She blacked out at around midnight while they were having sex. She did not recall seeing Petitioner in the bedroom and did not see anyone strike Jacob, although she was aware that Jacob did sustain a head injury. Elisha eventually returned to Wadsworth Street to look for

---

[3]
     Numerals preceded by "T." refer to pages from the transcript of Petitioner's trial, submitted by Respondent as an exhibit in connection with his answer to the petition.

her baby; she picked him up at the police station and spent the night at a friend's house.

After Elisha's testimony, trial counsel stated that he would need to secure the attendance of Cody Adams ("Adams"), who was incarcerated. The following morning, Adams was produced in court. The prosecutor noted that he had gone to the jail the night before to talk with Adams, who said that he had not been present when the crime occurred and then refused to speak any further. The prosecutor objected to trial counsel's request to call Adams on the basis that he did not have relevant testimony to offer. Trial counsel explained that Adams was related in some manner to Jacob, and that Jacob had told Adams, at a family gathering, that "they were setting up [Petitioner] and that he, in fact, was not the one that hit people on the head." T.272. In response, the prosecutor argued that the statement was hearsay and that, in any event, trial counsel first was required to lay a foundation for that testimony by asking Jacob whether he had made the statement that Adams assertedly would attribute to him. Trial counsel argued that Adams' testimony was admissible as a statement against Jacob's penal interests.

Following a recess, the trial judge held that Adams' proposed testimony was hearsay but also amounted to a declaration against Jacob's penal interests. However, because there was no independent evidence to support Adams' purported statement that Jacob said they were "setting Petitioner up" (i.e., evidence that someone other than Petitioner committed the crime), the trial judge held that

-5-

Adams' testimony did not have sufficient indicia of trustworthiness. Since trial counsel was unable "to put forth any other specifics upon which [t]he [c]ourt would permit that evidence to come in," the trial court precluded Adams' proposed testimony.

Trial counsel proposed recalling Jacob to lay a foundation for the admission of Adams' testimony, and the trial court agreed that counsel was entitled to make that application. The prosecutor noted that if trial counsel did call Jacob to testify as a defense witness, he could not later impeach him. The trial court indicated that it would take a brief recess to consider the legal issues raised by Adams' proposed testimony. The court also asked Petitioner directly whether he had discussed with his counsel whether he would testify, and whether he had made the decision not to testify knowingly and voluntarily. Petitioner stated that after discussing the matter with counsel, he had decided not to testify.

When court reconvened five minutes later, trial counsel announced that he was withdrawing his application to call Adams, and he rested his case. Trial counsel did not explain why he was not calling Adams, and the judge did not address the matter further. T.281-82.

On March 21, 2008, the jury convicted Petitioner as charged in the indictment. Following a hearing, the trial court adjudicated Petitioner a persistent violent felony offender. Petitioner received concurrent, indeterminate sentences aggregating 23 years to life.

**B.    The Direct Appeal**

Represented by new counsel, Petitioner pursued a direct appeal to the Appellate Division, Fourth Department, of New York State Supreme Court. Petitioner filed a pro se supplemental brief. On June 11, 2010, the Appellate Division unanimously affirmed the conviction. People v. Anthony, 74 A.D.3d 1795 (4th Dep't 2010). On September 17, 2010, the New York Court of Appeals denied leave to appeal. People v. Anthony, 15 N.Y.3d 849 (2010).

**C.    Post-Conviction Collateral Motions**

**1.    First Motion to Vacate Judgment**

In papers dated October 15, 2010, Petitioner filed a pro se motion to vacate the judgment with the trial court pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. He argued that on the second day of trial, as the trial proceeded to the defense case, jail officials ordered Petitioner to wear an "Electronic Security Belt System," or "stun belt." According to Petitioner, he informed counsel that he could not concentrate sufficiently to testify on his own behalf or participate in his defense because he was anxious that the belt would be activated. Petitioner faults counsel for failing to lodge an objection and address Petitioner's concerns. Petitioner also argued that his fear of receiving a shock prevented him from objecting when defense counsel told the court that he had decided not to call Adams. Petitioner asserted that the belt was uncomfortable, causing him to lean forward at the defense table and reveal to the jury a "big bulge protruding from [his]

back." , Petitioner's Affidavit, ¶ 23, Respondent's Exhibit ("Resp't Ex.") J. Because counsel had since died, Petitioner was unable to obtain an affidavit from counsel in support of the motion.

In opposition to the motion, the prosecutor noted that Petitioner had failed to inform the trial court that he was wearing the belt, or that it in any way detracted from his ability to participate in his defense. The prosecutor also argued that the claim was contradicted by the record, because the trial judge had conversed directly with Petitioner, on the record, regarding his decision not to testify. In these colloquies, Petitioner stated that he had discussed whether he should testify with his attorney and that his decision not to testify was made knowingly and voluntarily. See T.281-82. The prosecutor also noted that the trial court had not ordered the stun belt, and there was no indication in the record that it had any knowledge that Petitioner was even wearing the stun belt. Moreover, the prosecutor argued, due to the configuration of the courtroom, the stun belt was not visible to the jury. Petitioner filed a reply.

On November 9, 2010, the trial court denied the motion, holding that Petitioner's claims could have been raised on direct appeal and therefore were required to be dismissed pursuant to C.P.L. § 440.10(2)©. The trial court alternatively denied the motion pursuant to C.P.L. § 440.10(3)(a), which provides that a motion to vacate may be denied when the facts in support of the motion could have, with due diligence, been made to appear on the

record in a manner that would have permitted appellate review, but the defendant unjustifiably failed to do so, and the issue was not subsequently determined on appeal. Petitioner sought leave to appeal to the Appellate Division, which was denied on April 19, 2011.

### 2.    Second Motion to Vacate Judgment

In papers dated December 1, 2011, Petitioner filed a second C.P.L. § 440.10 motion. This time he contended that trial counsel was ineffective for not moving to suppress the "impermissible suggestive identifications" by Jacob and Collins, which were based on an allegedly suggestive photo array in which Petitioner was the only subject wearing a dark shirt. The prosecutor opposed the motion, and Petitioner filed a reply.

On January 9, 2012, the trial court held that it was required to deny the motion because Petitioner could have raised the claim on direct appeal. The trial court also held that "[t]o the extent that" Petitioner could have raised this claim in a prior motion to vacate and was in a position to so raise it, relief was denied pursuant to C.P.L. § 440.10(3)©. The Appellate Division denied leave on April 10, 2012.

### 3.    Applications for Writs of Error Coram Nobis

Petitioner filed a coram nobis motion dated April 18, 2012, in the Appellate Division, arguing that his appellate counsel was ineffective because he did not move pursuant to C.P.L. § 440.10 to argue that trial counsel was ineffective for not requesting a hearing to suppress the identifications from the photo arrays.

Petitioner contended that appellate counsel's failure to raise this claim in a C.P.L. § 440.10 motion caused the Appellate Division to find, on direct appeal, that this ineffective assistance of trial counsel claim was procedurally barred. Petitioner also argued that his appellate counsel was ineffective for not raising, in a C.P.L. § 440.10 motion, the claim that trial counsel was ineffective for failing to object to Petitioner having to wear a stun belt. In their opposition papers, the prosecution noted that appellate counsel had raised the claim that trial counsel had failed move to suppress the identifications and that the Appellate Division had addressed the claim on the merits. On June 8, 2012, the Appellate Division summarily denied the <u>coram</u> <u>nobis</u> motion. <u>People v. Anthony</u>, 96 A.D.3d 1511 (4th Dep't 2012). Petitioner apparently did not appeal the denial of this motion to the New York Court of Appeals.

In papers dated September 5, 2012, Petitioner filed another <u>coram</u> <u>nobis</u> motion, raising the same two claims asserted in his first coram <u>nobis</u> motion. The prosecution opposed the motion, and on November 9, 2012, the Appellate Division denied it. <u>People v. Anthony</u>, 100 A.D.3d 1472 (4th Dep't 2012). The New York Court of Appeals denied leave to appeal on March 25, 2013.

D.   **The Federal Habeas Proceeding**

This timely habeas petition followed, in which Petitioner asserts the following grounds for relief: (1) trial counsel was ineffective for (a) not requesting a <u>Wade</u> hearing in light of the fact that two witnesses viewed allegedly suggestive photo arrays,

and not "investigating" a misidentification defense; (b) making an insufficient motion for a trial order of dismissal; © failing to lay a foundation to allow Adams to offer testimony in support of Petitioner's "frame-up" defense; and (d) failing to object to the placement of a stun belt on Petitioner during trial; (2) the evidence was legally insufficient; and (3) appellate counsel was ineffective for not bringing a C.P.L. § 440.10 motion.

Respondent answered the petition, interposing the defenses of non-exhaustion and procedural default as to Petitioner's legal insufficiency claim and the defense of procedural default as to one of Petitioner's ineffective assistance of trial counsel claims. Petitioner filed a reply in which he did not address Respondent's asserted defenses. In the interests of judicial economy, the Court will address all of Petitioner's claims on the merits. See Dunham v. Travis, 313 F.3d 724, 729-730 (2d Cir. 2002) (discussing Lambrix v. Singletary, 520 U.S. 518, 523 (1997) (stating that "hurdling" the procedural bar is justified by a habeas court when the merits of a claim are easily resolvable against the petitioner).

III. **Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to Anthony's' petition, filed in 2013. AEDPA "revised the conditions under which federal courts may grant habeas relief to a person in state custody." Kruelski v. Connecticut Superior Court for Judicial Dist. of Danbury, 316 F.3d 103, 106 (2d Cir.2003) (citing 28 U.S.C. § 2254). Under AEDPA, a federal court may grant a writ of habeas corpus under 28 U.S.C. § 2254 only if

the state court's adjudication of the petitioner's claim on the merits ruling is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or involved an "unreasonable determination of the facts" in light of the evidence presented, 28 U.S.C. § 2254(d)(2). The Second Circuit has stated that "it is often appropriate in considering a habeas petition under the AEDPA for the federal court to go through two steps: first, the court determines what the correct interpretation of Supreme Court precedent is; second, if the state court's understanding or application of that precedent is determined to be erroneous, the federal court must still ask whether that error was a reasonable one." Kruelski, 316 F.3d at 106. Here, the Court need not determine whether Anthony's claims were adjudicated on the merits by the state courts, thereby triggering AEDPA review, because his claims fail even if the Court applies the less deferential, pre-AEDPA standard. Messiah v. Duncan, 435 F.3d 186, 197 (2d Cir. 2006).

## IV. Merits of the Petition

### A. Ineffective Assistance of Trial Counsel (Grounds One, Two, and Three of the Petition)

#### 1. Legal Principles

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court announced a two-part test to evaluate whether counsel was ineffective: A defendant first must show "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment" and second, that "there is a reasonable probability that, absent the errors [by counsel], the fact finder would have had a reasonable doubt respecting guilt." Id. at 687, 695. As discussed further below, the Court finds that all of Anthony's theories in support of his ineffective assistance of trial counsel claim are without merit under Strickland.

### 2.   Counsel's Alleged Errors

#### a.   Failure to Request a Wade Hearing

According to Anthony, trial counsel should have requested a Wade hearing to challenge the identification evidence on the basis that the identifications were the product of suggestive photo arrays. According to Anthony, the arrays shown to Jacob and Collins were unduly suggestive because he was the only subject wearing a dark-colored shirt. Relatedly, Anthony asserts that trial counsel should have pursued a "misidentification" defense instead of the "frame-up" defense adduced at trial.

In order to establish prejudice as the result of counsel's failure to request a suppression motion, the petitioner must establish that his underlying claim was "meritorious" and that "there is a reasonable probability that the verdict would have been different absent the excludable evidence." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986)). Even assuming that Anthony had a "meritorious" constitutional claim related to the photo arrays, which the Court does not find to be the case, there is no reasonable probability that the outcome of the trial would have

been different if trial counsel had pursued a <u>Wade</u> hearing. Even if the trial court had agreed, following a <u>Wade</u> hearing, that the photo arrays were suggestive, it would have suppressed only Collins' in-court identification of Anthony, as Collins had never seen Anthony before the night of the incident and thus had no independent basis for identifying Anthony. In contrast, Jacob had seen Anthony on one occasion prior to the night in question. Because he had an independent basis on which to identify Anthony, he would have been permitted to identify him at trial. See <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977).

The Court turns next to Anthony's contention that trial counsel should have advanced a misidentification defense. Counsel's strategic decisions are "virtually unchallengeable" under <u>Strickland</u>. 466 U.S. at 690. "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." <u>Henry v. Poole</u>, 409 F.3d 48, 63 (2d Cir. 2005) (quotation omitted). Here, the Court cannot say that trial counsel did not make a sound strategic decision in foregoing a misidentification defense, given that Anthony was placed at the crime-scene by Pesante, who had known Anthony for a long time and was related to him by marriage. By contrast, the frame-up defense that counsel argued to the jury was relatively stronger in that it was supported by Jacob's motivation to remove Anthony from the equation so that he could pursue reconciliation with Elisha. Anthony cannot show that trial counsel's strategic decision as far as the choice of defenses was objectively unreasonable, or that

-14-

there is any reasonable probability of a more favorable result had counsel pursued a misidentification defense.

### b.  Failure to Make an Adequate Motion for a Trial Order of Dismissal

Anthony contends that trial counsel was ineffective because his motion for a trial order of dismissal was insufficient to the extent that it was not grounded upon the alleged inconsistencies of the witnesses' accounts. However, the Appellate Division did not find that Anthony's insufficiency-of-the-evidence claim was unpreserved, and reviewed the claim on the merits. See People v. Anthony, 74 A.D.3d at 1796. Thus, Anthony cannot demonstrate any resultant prejudice. Moreover, the Court cannot say that trial counsel's performance was deficient in this regard. As Respondent notes, a trial order of dismissal motion is directed to the legal sufficiency of the prosecution's evidence, i.e., whether the prosecution has proven the elements of the crimes charged beyond a reasonable doubt. In contrast, the issue of whether the witnesses were inconsistent or incredible goes to the weight of the evidence, a claim that trial counsel need not preserve for appellate review. See N.Y. CRIM. PROC. LAW § 290.10(1); see also People v. Bleakley, 69 N.Y.2d 490, 495 (1985).

### c.  Failure to Lay a Foundation for Adams' Testimony

Anthony faults trial counsel for failing to lay a foundation, during his cross-examination of Jacob, the victim, to permit Adams to testify regarding a statement Jacob allegedly made to him that

they were "setting up [Petitioner]" for the crime. As set forth above in the Factual Background section of this Decision and Order, trial counsel announced his intention to call Adams to testify that Jacob had told Adams, at a holiday gathering, that "they were setting up [Petitioner] and that he, in fact, was not the one that hit people on the head." T.272. After hearing argument on the admissibility of this hearsay testimony and concluding that it lacked trustworthiness, the trial court declined to admit it. T.279-80. Trial counsel then suggested recalling Jacob to lay a foundation to admit Adams' testimony. The trial court stated it would recess briefly to consider the issues posed by that action, including whether counsel could then impeach Jacob as his own witness. T.280-81. When court reconvened, trial counsel withdrew, without explanation, his application to call Adams, and he rested his case. T.282.

As Respondent notes, the record is silent as to why trial counsel—who is deceased—decided not to recall Jacob or call Adams. However, this Court, sitting in habeas review, must "strongly presume[ ]" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690. An attorney's decision "whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000). Here, there was some risk in recalling Jacob and calling Adams. Jacob, if recalled as a defense witness, might

have denied that he made the statement to Adams, in which case
trial counsel would have been unable to impeach Jacob. Also,
counsel apparently had not spoken to Adams himself. The prosecutor
indicated that Adams had refused to speak to him, beyond denying
that he had been present at the time of the incident. Thus, Adams,
who was incarcerated in the county jail for reasons not present on
the record, was somewhat of a "wildcard." The law is clear that
"[a]ctions or omissions by counsel that 'might be considered sound
trial strategy' do not constitute ineffective assistance." Henry v.
Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S.
at 689); see also Harrington v. Richter, 131 S.Ct. at 790 (2011)
(Although courts may not indulge post hoc rationalization for
counsel's decisionmaking that contradicts the available evidence of
counsel's actions, neither may they insist counsel confirm every
aspect of the strategic basis for his or her actions.).

However, even assuming that trial counsel would have been able
to lay a foundation with Jacob's testimony to permit admission of
Adams' testimony, Petitioner has not established sufficient
prejudice flowing from counsel's decision to discontinue pursuit of
this strategy. As counsel's closing argument illustrates, he was
able to cull enough material from the proof presented to argue
cogently that Jacob had accused Petitioner of assaulting him
because Petitioner was standing in the way of Jacob getting back
together with Elisha. See T.285-98.

### d.    Failure to Object to the Stun Belt

Petitioner contends, as he did in support of his second C.P.L. § 440.10 motion, that trial counsel unreasonably failed to object to Petitioner wearing a stun belt; and that as a result of having to wear the stun belt, Petitioner declined to testify, was unable to assist in his defense, and was prejudiced because the jury could see a bulge in his back and thus knew he was wearing a restraint.

As Respondent points out, at the time of Petitioner's trial, the law in New York was unclear as to what findings, if any, were required to be placed on the record to justify the use of such a restraint. In People v. Buchanan, 13 N.Y.3d 1 (2009) (per curiam), the New York Court of Appeals held that a stun belt may not be used to restrain a criminal defendant during trial absent a finding of specific facts justifying the use of such a restraint. Id. at 3, 4. Buchanan was decided on June 30, 2009, more than two years after the jury rendered a verdict in Anthony's trial on March 21, 2008. Thus, at the time of Anthony's trial, "the procedures regarding the use of stun belts were unsettled." People v. Schrock, 108 A.D.3d 1221, 1225 (4th Dep't 2013).

"Counsel is not required to forecast changes in the governing law." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.), cert. denied, 513 U.S. 820 (1994); accord Jameson v. Coughlin, 22 F.3d 427, 429 (2d Cir. 1994) (counsel cannot be deemed incompetent for failing to predict that New York Court of Appeals would overrule Second Department's interpretation of the law). Because Buchanan addressed an apparent issue of first impression in New York, and because

-18-

Anthony's trial and conviction occurred before it was decided, trial counsel cannot be deemed ineffective for failing to make an objection to the placement of a stun belt on Petitioner.

With regard to Anthony's claim that counsel's failure to object to the stun belt impeded his ability to participate in his defense and deterred him from testifying, the Court rejects it as unsupported by anything other than Anthony's self-serving assertions. Wood v. Bartholomew, 516 U.S. 1, 8 (1995) (federal courts may not grant "habeas relief on the basis of little more than speculation with slight support"). The trial court addressed Anthony directly at trial on the issue of whether he wished to testify, and Petitioner never mentioned that the stun belt was the reason that he did not take the stand. Thus, the record belies Anthony's present claim that his inability to concentrate for fear of being shocked caused him not to testify or participate in his defense.

**B.   Insufficiency of the Evidence (Ground Four)**

Petitioner contends, as he did on direct appeal, that the evidence of his guilt was legally insufficient because it "rest[ed] solely upon highly questionable testimony that was incredible, manifestly untrue, physically impossible and contrary to experience." Petition, ¶ 22. On appeal, the Appellate Division summarily rejected his legal insufficiency claim as well as his claim that the verdict was against the weight of the credible evidence. Anthony, 96 A.D.3d at 1796.

Due process requires that the prosecution establish a defendant's guilt as to all elements of a criminal offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364 (1970). A verdict will be deemed consonant with due process principles if, after viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Thus, a petitioner "bears a very heavy burden" when challenging the sufficiency of the evidence supporting his state criminal conviction. Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 840 (2d Cir. 1997).

The only element that Petitioner's legal insufficiency argument appears to address is proof of identity. Petitioner argues that it was too dark in the bedroom for Jacob to have seen who struck him with the pipe. Petitioner points out Collins' testimony as to how quickly the perpetrator ran down the stairs and out of the house, and contends that Collins and Todd could not have seen Petitioner's face when he passed them at the bottom of the stairs. However, the prosecution introduced proof from Petitioner's relative-by-marriage, Pesante, that he was at the scene of the crime. With regard to other witnesses' abilities to identify Petitioner, this Court must defer to the jury's resolution of these issues. In Cavazos v. Smith, 565 U.S. 1, 132 S. Ct. 2 (2011) (per curiam), the Supreme Court explained that Jackson "unambiguously instructs that a reviewing court 'faced with a record of historical

-20-

facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" 565 U.S. at ___, 132 S. Ct. at 6 (quoting <u>Jackson</u>, 443 U.S. at 326). Jacob had met Petitioner once before and testified that there was sufficient light for him to see who struck him with the pipe or rod. Unlike Jacob, neither Todd nor Collins had ever seen Petitioner before. Nevertheless, the jury was entitled to credit their testimony that the area at the bottom of the stairs was brightly lit and that they were able to see Petitioner's face despite how quickly he was moving through the house. Petitioner's arguments go to the credibility of the witnesses and the inferences to be drawn from their testimony–arguments already made to, and rejected by, the jury. This Court may not revisit the jury's determination on these issues. See <u>Parker v. Matthews</u>, 132 S. Ct. 2148, 2152 (2012) ("'[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from evidence admitted at trial.'") (quoting <u>Cavazos</u>, 132 S. Ct. at 3)). Habeas relief therefore is unwarranted on Petitioner's legal insufficiency claim.

**C.   Ineffective Assistance of Appellate Counsel (Grounds Five and Six)**

According to Petitioner, appellate counsel was ineffective for failing to use the "proper procedural vehicle" to assert Petitioner's claims of ineffective assistance of trial counsel. That is, appellate counsel erroneously did not file a motion to

vacate the judgment pursuant to C.P.L. § 440.10 on the grounds that trial counsel was ineffective for not requesting a Wade hearing and for not objecting to Petitioner wearing a stun belt during trial.

The standard set forth Strickland, 466 U.S. at 688, 694, also applies to claims of ineffective assistance of appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000). To establish ineffective assistance of appellate counsel based on the failure to raise specific issues, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Effective appellate advocacy entails winnowing out weaker arguments and focusing on the issues that present "the most promising issues for review." Jones v. Barnes, 463 U.S. 745, 751 53 (1983). Instead, a habeas petitioner must show that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo, 13 F.3d at 533. In the appellate context, the prejudice prong requires the petitioner to show that "there was a 'reasonable probability' that [his] claim would have been successful before the [state's highest court]." Id. at 534 (alterations in original).

At the outset, the Court notes that a court-appointed appellate attorney is not obligated to bring a C.P.L. § 440.10 motion to vacate. Mitchell v. Artus, No. 07 Civ. 4688, 2008 WL 2262606, at *37 & n. 55 (S.D.N.Y. June 2, 2008) (collecting cases). With regard to the specific contention that appellate counsel was

ineffective for not making a C.P.L. § 440.10 motion to argue that trial counsel was ineffective for failing to request a Wade hearing, appellate counsel did raise that claim on direct appeal. The Appellate Division did not dismiss it on the basis that it was based on matters dehors the record and should have been raised in a motion to vacate but instead considered it on the merits. See Anthony, 74 A.D.3d at 1796 (finding that after "viewing the evidence, the law, and the circumstances of this case in totality and as of the time of the representation," Petitioner "received meaningful representation"). Thus, Petitioner cannot show that appellate counsel erred, or that prejudice resulted from his failure to bring a C.P.L. § 440.10 motion on the basis that trial counsel erroneously failed to request a Wade hearing.

Furthermore, appellate counsel was not ineffective in failing to assert in a C.P.L. § 440.10 motion that trial counsel should have objected to Petitioner's wearing of a "stun belt." As explained above, trial counsel could not have been ineffective for failing to lodge an objection based on the stun belt order issued by jail officials, because at the time of trial, the New York Court of Appeals had not yet held that a trial court must make specific findings before a defendant is required to wear a stun belt. People v. Buchanan, 13 N.Y.3d at 4. Trial counsel cannot be faulted for failing to predict changes in the governing law. Jameson, 22 F.3d at 429. It follows that appellate counsel cannot be found ineffective for declining to assert a meritless ineffective assistance of trial counsel claim. Moreover, Petitioner was not

prejudiced by appellate counsel's failure to raise this argument, because it would not have been successful on appeal.

**V.    Conclusion**

For the foregoing reasons, the request for writ of habeas corpus by Robert Anthony is denied, and the petition (Dkt #1) is dismissed. Because Petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     February 10, 2014
           Rochester, New York.